Filed 3/18/22

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| COLONIAL VAN & STORAGE, INC. | No. B317125 |
| Petitioner, | |
| v. | (Fresno County Super. Ct. Nos. 18CECG00586, 18CECG02656) |
| THE SUPERIOR COURT OF FRESNO COUNTY, | |
| Respondent; | |
| CRYSTAL D. DOMINGUEZ et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Kristi Culver Kapetan, Judge of the Superior Court of Fresno County. Petition granted.

Horvitz & Levy, Mitchell C. Tilner, Mark A. Kressel; Bremer Whyte Brown & O'Meara, Keith G. Bremer, Karen M. Baytosh and August B. Hotchkin for Petitioner Colonial Van & Storage, Inc.

No appearance for Respondent.

Marderosian & Cohen, Michael G. Marderosian, Heather S. Cohen; Law Offices of Frank M. Nunes and Frank M. Nunes for Real Party In Interest Crystal D. Dominguez.

Haffner Law, Joshua H. Haffner and Graham G. Lambert for Real Parties In Interest Rachel Schindler et al.

_____

A young man suffering from a mental health condition suddenly fired a handgun at family members and guests inside his family home. Among the injured were his mother's coworker and a business associate, who were both involved in work-related activities with the mother and stepfather at the time. An employer has an affirmative duty to provide employees with a safe place to work. (Lab. Code, § 6400, subd. (a); *Seabright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 603.) Does this duty include ensuring that an off-site meeting place for coworkers and business associates like an employee's private residence is safe from third party criminal harm? We hold the answer is "No."[1] In light of our holding, we grant the writ petition challenging the court's order denying the summary judgment motion in this case and direct the trial court to enter a new and different order granting summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Shooting

Colonial Van & Storage, Inc. (Colonial) is a moving and storage company in Fresno that services California and Nevada. Colonial recognized in its Employee Handbook that workplace violence is "a growing nationwide problem necessitating a firm, considered response by employers." As part of its workplace antiviolence policy, Colonial enumerated behaviors that may constitute workplace violence if they involved Colonial employees on and off Colonial premises. The handbook further stated that workplace violence "will not be tolerated" and offenders would be immediately removed from Colonial premises and face possible disciplinary action following an investigation.

---

[1] In a separate order, we granted the motion to strike exhibit No. 3 filed in this court under seal in opposition to the writ petition. Because the exhibit under seal was not introduced in the trial court, it is not part of the record in this proceeding. (*Mission Imports, Inc. v. Superior Court* (1982) 31 Cal.3d 921, 927, fn. 5; *Pomona Valley Hospital Medical Center v. Superior Court* (2013) 213 Cal.App.4th 828, 835, fn. 5.) Accordingly, we do not consider it.

Carol Holaday (Holaday) and her husband Jim Willcoxson[2] (Willcoxson) were employed by Colonial. Holaday was a supervisor and a long-haul dispatcher. She typically worked at Colonial's Fresno office but was authorized to work at home at her discretion. Holaday often had coworkers visit her home for social and work-related reasons. Willcoxson was a Colonial sales representative. His job entailed traveling to various places and making telephone calls.

Kyle Holaday (Kyle) was unemployed and had been residing with his mother and Willcoxson for approximately two years. He was 26 years old, a veteran of the Iraq and Afghanistan wars, and suffered from posttraumatic stress disorder (PTSD) for which he was receiving outpatient treatment. Kyle had a history of self-harm and misuse of firearms. He frequently left loaded guns around the home and shot birds and rodents on one occasion.

Crystal Dominguez[3] (Dominguez) was a Colonial employee and worked with Holaday at the Fresno office. She was a frequent visitor to Holaday's home and considered Kyle a friend.

Rachel Schindler (Schindler) was employed by another moving company that worked with Colonial. She knew Holaday in a business capacity and had been to her home a few times. Schindler had only briefly met Kyle.

On the evening of March 24, 2017, Holaday and Willcoxson hosted a dinner in their Fresno home for Dominguez and Schindler. Schindler brought her five-month-old daughter with her. The four adults were socializing, but also networking and engaged in job-related tasks. Kyle was present at the time. After acknowledging the arriving guests, Kyle sat in the living room and looked at his cell phone.

---

[2] The surname of Holaday's husband is also spelled as "Wilcoxson." For consistency, we use the Willcoxson spelling in the superior court exhibits.

[3] We spell her surname as Dominguez in conformity with the spelling she gave at Kyle's preliminary hearing. However, her surname is spelled inconsistently as "Dominquez" throughout the record.

At one point Willcoxson went into the kitchen while the three women talked in the living room. Without speaking, Kyle left the living room and returned with a handgun and began firing. He shot and killed Willcoxson and a family dog and wounded Holaday, Dominguez, and Schindler. A bullet grazed the baby's ear. Kyle fled from the home and was struck by a moving car when he ran into the street. Police arrived and arrested him.[4]

## II. The Lawsuits

Dominguez and Schindler (collectively plaintiffs) each filed a lawsuit against Colonial and Holaday for personal injury damages. Dominguez's operative complaint alleged causes of action for negligence and intentional infliction of emotional distress against Colonial and Holaday and negligent supervision against Holaday alone. As to all causes of action, Dominguez alleged Colonial was vicariously liable for Holaday's misconduct pursuant to the doctrine of respondeat superior.

Schindler's separate complaint filed on behalf of herself and her baby daughter pleaded the same causes of action against Colonial and Holaday, alleging substantially the same allegations. The two lawsuits were later consolidated.

## III. The Summary Judgment Motion

Colonial moved for summary judgment on plaintiffs' direct negligence claim for lack of duty because Colonial did not own, possess, or control the home where the shooting occurred, and on all claims because the shooting was an unforeseeable event.

Plaintiffs filed opposition. As to the claims of direct negligence and intentional infliction of emotional distress against Colonial, plaintiffs asserted there were triable issues whether Colonial owed plaintiffs a duty to protect because Colonial controlled the home where

---

[4] Kyle ultimately pleaded no contest to one count of murder, three counts of attempted murder, and one count of animal cruelty. The superior court found Kyle was legally insane at the time of the offenses and commented that Kyle's acts were "inexplicable," "irrational," and "without warning." The court sentenced him accordingly.

the shooting occurred; Colonial knew or should have known of the dangers Kyle posed and the corresponding risks associated with using the home as a work site.  Both plaintiffs also contended there were triable issues whether Colonial was vicariously liable for Holaday's alleged negligent and intentional misconduct under the doctrine of respondeat superior.

Following a hearing, the trial court denied summary judgment finding as disputed facts:  (1) the extent to which Colonial employees performed work in Holaday's home; (2) the purpose of Dominguez's presence at the home on the evening of the shooting; (3) how long Kyle had lived at the home; and (4) whether plaintiffs were friends with Kyle.  The court entered its order denying the motion on July 23, 2020.

## IV.   The Writ Petition

On August 21, 2020, Colonial filed a petition for writ of mandate urging the Fifth District Court of Appeal to vacate the trial court's order denying the motion for summary judgment and enter a new order granting summary judgment.[5]  After receiving opposition from plaintiffs and a reply in support of Colonial's petition, the appellate court issued an order to show cause why the relief requested in the petition should not be granted.[6]

### DISCUSSION

## I.   The Propriety of Writ Review

"[W]rit review is appropriate only when (1) 'the remedy by appeal would be inadequate' [citation] or (2) the writ presents a 'significant issue of law' or an issue of 'widespread' or 'public interest.' " (*California Dept. of Tax & Fee Administration v. Superior Court* (2020) 48 Cal.App.5th 922, 929.)  Writ review is appropriate in this case because an order denying a summary judgment motion is not appealable (see

---

[5] Codefendant Holaday is not a party to this writ proceeding.

[6] After Dominguez filed a return, the California Supreme Court transferred the case from the Fifth District Court of Appeal to the Second District Court of Appeal for decision.  Schindler has also filed a return.

Code Civ. Proc., § 904.1, subd. (a)) and Colonial's petition presents an issue of law that is of paramount importance to public welfare during the current Covid-19 pandemic: Whether an employer has a duty to ensure that off-site work locations are safe from third party criminal conduct.[7]

## II.     Summary Judgment

"A defendant is entitled to summary judgment if it can 'show that there is no triable issue as to any material fact.' [Citation.] The defendant bears the initial burden of establishing that the plaintiff's cause of action has 'no merit' by showing that the plaintiff cannot establish 'one or more elements of [the] cause of action.' [Citation.] If this burden is met, the 'burden shifts' to the plaintiff 'to show that a triable issue of one or more material facts exists as to the cause of action.' " (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 924, fn. omitted.)

We review the denial of a motion for summary judgment de novo, and thus do not defer to the trial court's rulings or reasoning. (*Camarillo v. Vaage* (2003) 105 Cal.App.4th 552, 560; *Burgueno v. Regents of University of California* (2015) 243 Cal.App.4th 1052, 1057.)

## III.    Plaintiffs' Direct Negligence Claim Against Colonial

To establish a cause of action for negligence, a plaintiff must allege facts showing a legal duty to use due care, breach of the duty, causation, and damages. (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.) Duty is a threshold issue, a question of law for the court, and reviewed de novo on appeal. (*Id.* at p. 1142.) Every person has a duty in his or her activities to exercise reasonable care for the safety of others. (Civ. Code, § 1714, subd. (a).) Yet this duty "is not absolute"; a defendant does not necessarily owe every plaintiff a duty of care. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 215.) Generally,

---

[7] Plaintiffs also contend the writ petition should be summarily denied in light of the trial court's denial of Colonial's summary judgment motion on procedural as well as substantive grounds. However, plaintiffs have cited no authority that precludes us on jurisdictional grounds from reviewing the merits of this writ petition.

" 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619; accord, *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 ["as a general matter, there is no duty to act to protect others from the conduct of third parties"].)

Plaintiffs argue Colonial's summary judgment motion was properly denied. Their arguments advance two reasons the no-duty-to-protect rule is inapplicable here: (1) Colonial owed both plaintiffs a duty to protect. Plaintiffs' theory is that Colonial had an affirmative duty to protect them because Colonial controlled the home where the shooting occurred and Kyle's harm was foreseeable. (2) A special relationship between Dominguez and Colonial gave rise to Colonial's duty to protect. Dominguez theorized her employer-employee relationship with Colonial required a finding of liability premised on Holaday's negligent and intentional misconduct.

For both theories, plaintiffs must also show that imposing a duty on Colonial in these circumstances is warranted under the *Rowland* factors (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*)). In other words, if imposed, the boundaries of that duty encompassed the burden to protect them against a once-in-a-lifetime shooting rampage.

Our analysis of cases relating to plaintiffs' theories and the *Rowland* factors leads us to the conclusion that an employer does not have a duty to protect working-at-home employees from third party criminal conduct as a matter of law.

### A. Colonial Owed No Duty To Protect Plaintiffs Because Colonial Did Not Control Holaday's Home

A defendant's control over property is sufficient to create a duty to protect owed to persons using the property. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162, 1166; accord, *Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168, 177 ["the rationale being that whoever has the means to control the property can take steps to prevent the harm"].) Conversely, absent any control of the property, a defendant cannot be held liable for a dangerous condition on that property. (*Cody F. v.*

7

*Falletti* (2001) 92 Cal.App.4th 1232, 1241 [" '[t]he law does not impose responsibility where there is no duty because of the absence of a right to control' "]; accord, *Soto v. Union Pacific Railroad Co.,* at p. 177; *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1084 [generally, there is no right to control another's property].)

In support of its summary judgment motion, Colonial presented evidence that it did not own, possess, or control the home where the shooting occurred; the home was Holaday's private residence. Plaintiffs do not dispute Colonial's lack of ownership and possession, but they contend there was a triable issue whether Colonial controlled the property, thus creating a duty to protect. Plaintiffs also argue Colonial exercised control of the home by enjoying a commercial benefit from its use as a work site.

### 1. Colonial did not engage in behavior commensurate with controlling the home

When it comes to property, " 'control' " is defined as the " 'power to prevent, remedy or guard against the dangerous condition.' " (*Public Utilities Com. v. Superior Court* (2010) 181 Cal.App.4th 364, 378; *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 833–834.) This involves a " 'dramatic assertion of a right normally associated with ownership or at least . . . possession' " of the subject property (*Contreras v. Anderson* (1997) 59 Cal.App.4th 188, 200) or "undertaking affirmative acts that are consistent with being the owner or occupier of the property" (*Lopez v. City of Los Angeles* (2020) 55 Cal.App.5th 244, 258). Accordingly, defendants have been found to control property in which they have no legal interest by taking some overt action directed at the property to modify or improve it beyond simple upkeep. For example, constructing a fence around the property (*Alcaraz v. Vece, supra,* 14 Cal.4th at pp. 1161–1162); erecting a Neon sign to illuminate the property (*Johnson v. De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394, 401); installing sprinklers, planting trees, and maintaining the property (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1335); or mowing and watering the property, removing debris, and

repairing any holes in the grassy surface (*Low v. City of Sacramento, supra,* 7 Cal.App.3d at pp. 830, 834).

On the other hand, defendants were found not liable for slip and fall injuries sustained on public sidewalks abutting their property caused by third parties having deposited dog feces (*Selger v. Steven Bros.* (1990) 222 Cal.App.3d 1585, 1591–1592), or rubbish and other detritus (*Bolles v. Hilton & Paley, Inc.* (1931) 119 Cal.App.126, 127–128; accord, *Lopez v. City of Los Angeles, supra,* 55 Cal.App.5th at p. 258). The rationale being that in those instances the defendants did not exert sufficient control over the property by effectively treating it as their own to warrant imposition of a duty of care. (*Lopez*, at p. 256.)

The record contains no evidence suggesting Colonial directed or engaged in some overt acts with respect to the home associated with business ownership. For example, there was no evidence that Colonial set specific hours for the employees to work in the home, provided or paid for landscaping or a security system, designated the home as a business location for insurance and tax purposes, or named the home as an extension of its business in any in-house documents or communications with outside businesses.

Further, California courts have declined to impose a duty to protect for tortious or criminal harm committed by third parties on property that defendants, like Colonial, did not actually own, possess, or control. (See, e.g., *Nevarez v. Thriftimart, Inc.* (1970) 7 Cal.App.3d 799, 805–806 [shopping center operator was not liable for injuries sustained by child who was struck by a car after running into a public street during a carnival at the shopping center]; *Steinmetz v. Stockton City Chamber of Commerce* (1985) 169 Cal.App.3d 1142, 1144, 1146–1147 [business hosting a mixer was not liable for murder of a guest who was fatally stabbed returning to her car in an off-premises parking lot that the business did not own, possess, or control]; *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 385–387 [grocery store was not liable for injuries to a customer struck by a car while on a public street adjacent to store]; *Martinez v. Pacific Bell* (1990) 225 Cal.App.3d 1557, 1561–1562 [telephone company was not liable for parking

9

attendant's injuries sustained in an attack by criminals attracted to the parking lot by a public phone booth located on adjacent property].)

### 2. Deriving a commercial benefit from the use of the home does not create a duty to protect

In support of their theory that Colonial controlled the home where the shooting occurred, plaintiffs rely on *Southland Corp. v. Superior Court* (1988) 203 Cal.App.3d 656 (*Southland Corp.*). The issue in *Southland Corp.* was whether a convenience store was liable for third party criminal harm that occurred on adjacent property in which the store had no legal interest. A store customer was assaulted in a vacant lot typically used for customer parking that was neither owned nor leased by the store. (*Id.* at p. 660.) The Court of Appeal concluded there was a triable issue whether the store controlled the vacant lot, and thus owed the injured customer a duty to protect. (*Id.* at p. 661.) The court explained a customer's perception that the lot was controlled by the store "may not have been unreasonable" (*ibid.*) because the store "realized a significant commercial benefit" from its use of the lot for parking (*id.* at p. 667).

In *Alcaraz v. Vece, supra,* 14 Cal.4th 1149, our Supreme Court traced the origin and use of " 'commercial benefit' " in earlier appellate court decisions that addressed a defendant's liability for injuries incurred on nearby property in which the defendant held no legal interest. (*Id.* at pp.1163–1166.) Among the cases the court examined was *Southland Corp.* (*Alcaraz*, at pp. 1163–1164.) In brief, the court concluded that in each of those cases, including *Southland Corp.*, deriving a commercial benefit was not the "dispositive" factor relating to the issue of defendant's control. (*Alcaraz,* at p. 1163; see *Lopez v. City of Los Angeles, supra,* 55 Cal.App.5th at p. 263.) Indeed, in its opinion, the *Southland Corp.* court pointed to other factors indicating the store may have treated the vacant lot as its own. Among them, that the store manager had taken steps to remove loiterers from the lot by demanding that they leave or calling the police. (*Southland Corp., supra,* 203 Cal.App.3d at p. 661.) In other words, the store

10

dramatically asserted a right normally associated with property ownership.

More recently, we considered, albeit in a different factual context, this same deriving-a-commercial-benefit argument, noting it "effectively makes commercial benefit the sole predicate for the imposition of a duty of care."[8] (*Lopez, supra,* 55 Cal.App.5th at p. 263.) Tracing our reasoning in *Lopez*, we conclude plaintiffs' proposed definition of control, apart from being contrary to precedent, would mean that every employer would be absolutely liable for any injury suffered at home by working-at-home employees. (*Ibid.*) To avoid liability, employers would have the onerous task of ensuring these employees maintained the safety of their private residences and the mental health of their fellow residents and invitees. We reject plaintiffs' "invitation to distort the recognized principles of premises liability or negligent management of property by such means." (*Martinez v. Pacific Bell, supra,* 225 Cal.App.3d at p. 1563.)

**B.** **Colonial Owed Dominguez No Duty To Protect Based on the Employer-Employee Relationship**

A defendant may have an affirmative duty to protect the plaintiff from harm by a third party "even though the risk of harm is not of the defendant's own making," if a special relationship exists. (*Brown v.*

---

[8] In *Lopez*, we affirmed the trial court's order granting judgment notwithstanding the verdict after a jury found a business partially liable for an injury to plaintiff, a pedestrian, who stepped in a pothole located on abutting city-owned property where the lip of a driveway and the sidewalk gutter met. (*Lopez v. City of Los Angeles, supra,* 55 Cal.App.5th at pp. 250–251.) We concluded the duty to exercise care to maintain property in a safe condition did not obligate the business to repair the pothole. The business did not exercise control merely by putting the driveway and gutter to their ordinary uses. (*Id.* at pp. 259–261.) We rejected the position that the business had de facto control over the area because the commercial benefit it derived from the driveway and gutter was not dispositive of the issue of control, defined as the dramatic assertion of any of the rights normally associated with ownership or possession. (*Id.* at pp. 263–264.)

11

*USA Taekwondo, supra,* 11 Cal.5th at p. 215; *Regents of University of California v. Superior Court, supra,* 4 Cal.5th at p. 619.) "Relationships that have been recognized as 'special' share a few common features. Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection. [Citations.] . . . [¶] The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection. '[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." ' " (*Regents of University of California v. Superior Court,* at pp. 620–621.) As a result, the plaintiff can claim a right to expect the defendant's protection. (*Brown v. USA Taekwondo,* at p. 216.)

Dominguez contends as Colonial's employee she had a special relationship with her employer. (See *Brown v. USA Taekwondo, supra,* 11 Cal.5th at p. 216 [examples of special relationships creating an affirmative duty to protect include the relationship between employers and employees]; accord, *Regents of University of California v. Superior Court, supra,* 4 Cal.5th at p. 620.) According to Dominguez, Colonial was therefore required to undertake measures to protect its working-at-home employees from third party criminal harm.[9] (See Rest.3d Torts, Liability for Physical and Emotional Harm (2012) § 40, subds. (a) & (b)(4) [special relationships include "an employer with its employees who, while at work, are: [¶] (a) in imminent danger; or [¶] (b) injured or ill and thereby rendered helpless"].)

However, Dominguez cannot call upon the special relationship exception here. The scope of her employer-employee relationship with Colonial did not extend to the facts of this case. The shooting did not occur at Dominguez's place of employment, but as discussed, at a private residence that Colonial did not control. (See Rest.3d Torts,

---

[9] Schindler produced no evidence that she was Colonial's employee and does not claim the special relationship exception.

*supra*, § 40, com. k ["The circumstances in which the affirmative duty imposed in this Subsection might apply have been largely limited to the risk to an employee of a criminal attack by a third party that *occurs at the place of employment*," italics added]; *Regents of University of California v. Superior Court, supra*, 4 Cal.5th at pp. 625–626 [although the university was in a special relationship with enrolled students, its duty to protect them from third party criminal harm was limited to curricular-related activities or school-sponsored events on facilities the university controlled].) Dominguez could not reasonably expect any protection afforded by its special relationship with Colonial to reach into the setting of a private residence.

The special relationship exception may also apply when the defendant is able to control the conduct of the dangerous third party. (*Brown v. USA Taekwondo, supra,* 11 Cal.5th at p. 211.) In contending Colonial was obligated to keep the home safe, Dominguez argues Colonial negligently failed to control Kyle. Yet she failed to show Colonial had a special relationship with Kyle that enabled it to prevent his unprovoked assault. (See *Regents of University of California v. Superior Court, supra*, 4 Cal.5th at p. 619; *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1094, affd. (2021) 11 Cal.5th 204 [USA Taekwondo's duty to protect plaintiff from coach's sexual assault stemmed from its special relationship ability to control coach's conduct].)

C.     **The *Rowland* Factors Counsel Against Imposing a Duty to Protect**

The *Rowland* court instructs us to balance foreseeability-related factors and public policy factors in deciding whether to depart from an implicated duty of care. (*Brown v. USA Taekwondo*, *supra,* 11 Cal.5th at pp. 217–218; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771.) Based on these factors, we conclude that even if Colonial controlled the home or shared a special relationship with Dominguez so as to give rise to a duty to protect one or both plaintiffs, negligence liability should be precluded in this case. In so holding, we are not unmindful of plaintiffs' devastating injuries and Kyle's horrific acts of

13

violence. Rather, guided by the *Rowland* factors, and particularly by the unforeseeability of this unique and tragic event, we conclude that imposing on an employer, like Colonial, a duty to ensure that a working-from-home employee's private residence is safe for visiting coworkers and business associates would be entirely unfounded and unfair.

### 1.    The *Rowland* foreseeability-related factors

The foreseeability-related factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, [and] the closeness of the connection between the defendant's conduct and the injury suffered." (*Rowland, supra*, 69 Cal.2d at p. 113; see *Cabral v. Ralphs Grocery Co., supra,* 51 Cal.4th at p. 771.)  Of these three factors, whether the injury was foreseeable is the most important in determining whether an exception should exist to the duty to protect.  (*Regents of University of California v. Superior Court, supra*, 4 Cal.5th at p. 629.)  Our task " 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed.' " (*Cabral,* at p. 772; accord, *Regents of University of California,* at p. 629.)  We do, however, evaluate the kind of third party conduct involved in light of all the surrounding circumstances as probative in assessing generally whether the category of Colonial's alleged negligent conduct is sufficiently likely to result in the kind of harm plaintiffs experienced.  "What is 'sufficiently likely' means what is ' "likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." ' " (*Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 895.)

Of the three foreseeability-related factors, only one, the degree of certainty that the plaintiff suffered injury, counsels in favor of a duty to

14

protect.  Undoubtedly, plaintiffs experienced serious injuries in this case.

With respect to the factor of the foreseeability of harm, plaintiffs have produced no evidence that Colonial had actual knowledge that Kyle posed a risk of harm to working-at-home employees.  In his deposition, the son of Colonial's owner, who oversaw Fresno office operations, testified he was unaware of Kyle's mental health problems and access to multiple firearms in the home.  Plaintiffs presented no evidence that any Colonial representative knew of Kyle's PTSD and gun use.

Nor does a review of the surrounding circumstances emphasized by plaintiffs make the shooting foreseeable:  Holaday's knowledge of Kyle's mental disorder, violent past, and gun use cannot be imputed to Colonial.  That is because, generally, an employee's knowledge is imputed to the employer only if that knowledge is within the scope of the employee's employment.  (See *Santillan v. Roman Catholic Bishop of Fresno* (2008) 163 Cal.App.4th 4, 10–12; *Westman v. Clifton's Brookdale, Inc.* (1948) 89 Cal.App.2d 307, 311.)  The facts of Kyle's mental disorder, violent past, and gun use are not related to the business of Holaday and Colonial, so Holaday had no duty to disclose them.  Kyle was not an employee nor did he conduct any business with Holaday or Dominguez (or Schindler).  For her part, Schindler asserts that Colonial's denial of any knowledge "is preposterous."  However, " '[a]n issue of fact can only be created by a conflict of evidence.  It is not created by "speculation, conjecture, imagination or guesswork." ' " (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1014.)

Moreover, there were no reports of similar incidents that may have put Colonial on notice of a potential murderous attack on working-at-home employees.  Plaintiffs offered no evidence of prior threats or acts of violence by Kyle against Colonial employees or anyone else, or of third party criminal acts by others against working-at-home employees that would have portended this particular assault.  (Cf. *Regents of University of California v. Superior Court*, *supra*, 4 Cal.5th at pp. 629–630 [task force reports and incidents of

15

unprovoked student violence placed postsecondary schools on notice of possible on-campus student attacks]; *Brown v. USA Taekwondo, supra,* 40 Cal.App.5th at pp. 1097–1098 [reported incidents of Taekwondo coaches engaging in improper sexual conduct with youth athletes made such conduct foreseeable to governing organization]; *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 676 [Archdiocese's receipt of numerous reports of sexual assaults by clergy in parish schools made foreseeable a priest's sexual abuse of plaintiff at parish school].)

Schindler contends the shooting was "generally foreseeable" because of the current prevalence of workplace violence as acknowledged by Colonial in its workplace antiviolence policy. It is undeniable that shootings and other forms of violence can and do happen in the workplace. But for foreseeability in the context of a duty to protect, "[m]ore than a mere possibility of occurrence is required since, with hindsight, everything is foreseeable." (*Friedman v. Merck & Co.* (2003) 107 Cal.App.4th 454, 465.)

The third foreseeability-related factor is the closeness of the connection—or causal nexus—between the defendant's conduct and the injury suffered. Plaintiffs argue Colonial negligently failed to take steps to ensure the home was safe from Kyle's potential violence. In cases like this one involving third party criminal conduct, "the existence of an intervening act does not necessarily attenuate a defendant's negligence. Rather, 'the touchstone of the analysis is the foreseeability of that intervening conduct.' " (*Regents of University of California v. Superior Court, supra,* 4 Cal.5th at p. 631; see *Kesner v. Superior Court, supra,* 1 Cal.5th at p. 1148.) We discern no causal nexus here. Kyle's deranged and motiveless attack was so unlikely to occur within the setting of modern life that a reasonably prudent employer would not envision its occurrence in considering the obligation to protect employees from reasonably foreseeable harm.

### 2. The *Rowland* public policy factors

The public policy factors are "the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of

the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra*, 69 Cal.2d at p. 113; *Cabral v. Ralphs Grocery Co., supra,* 51 Cal.4th at p. 781; accord, *Issakhani v. Shadow Glen Homeowners Assn., Inc., supra*, 63 Cal.App.5th at pp. 927–928.)

The public policy factors counsel against imposing a duty on employers to ensure that working-at-home employees are safe from third party criminal conduct. The extent of the burden to employers having to shoulder such a duty and the consequences to affected employees would be extremely onerous. First, employers would become the insurers of the safety of working-at-home employees in the event of any intentional harm, even if the employer had no reason to expect it. This is an unrealistic obligation. To avoid liability, employers would be compelled to undertake costly and time-consuming measures—among them, inspecting the home for weapons and other safety hazards, vetting all residents and visitors, and monitoring the daily activities of residents, visitors, and the condition of the home at least during working hours. Maintaining the safety of the home may also include building a fence, posting security guards, and installing metal detectors, security systems, and video cameras inside and outside the home.

Second, for employees, the employer's efforts to avoid liability would exact a high social cost. Employees would have to be willing to accept their employer's intrusions into their daily lives, the modifications to their home, and working in a state of siege. Further, an employer's background checks could potentially endanger the employees' rights to privacy and association, and in certain instances, would be prohibited. For example, federal and state laws would block an employer's access to the medical, criminal, and driving records of employees and other occupants of the home. Employees would be faced with surrendering these records to their employer on demand or face possible termination or other job-related penalties. And what if those records yielded embarrassing or potentially damaging information

17

about one or more of the residents or visitors? Would the employer have to make sure those individuals are banned from the home? Would employees living in locations with higher crime rates or having visitors and fellow residents with frequent law enforcement contacts be subject to greater employer scrutiny? Would employers then be inclined to fire, refuse to hire, or otherwise discriminate against those employees in conditions of employment?

Finally, when criminal conduct is induced by a mental disorder, employers are not in the best position to stave off a violent outburst. Thus, shifting the burden from medical professionals to employers to deter such conduct would not necessarily prevent future harm to working-at-home employees. Reasonable precautions would not likely stop an irrational explosive attack or keep random victims from sustaining injuries. For that reason, Colonial is neither morally culpable nor blameworthy for its failure to anticipate or prepare for Kyle's PTSD-related shooting.

Plaintiffs claim employers could avoid liability and the difficulties of providing safety by simply refusing to allow employees to work at home. However, this too would create substantial burdens. First, in certain circumstances, like the recent pandemic's stay-at-home orders, many employees would be required to work at home. Second, many employees need to work at home for purposes of child care, elder care, or their own disabilities. Not allowing these employees to work at home because their employer decided that someone else visiting or residing in the home may present a risk of criminal activity would be unduly difficult, particularly for those employees who could not afford the expense of necessary child or elder care.

As for insurance, the employer's duty proposed by plaintiffs is bordering on absolute liability which, due to its enhanced risk, would result in increased premiums, if insurance would be available at all.

From the foregoing discussion it clearly appears the *Rowland* factors fail to support an employer's duty to ensure that working-at-home employees are safe from third party criminal harm. Additionally, the lack of foreseeability and sound public policy counsel against the

imposition of liability upon Colonial.  Moreover, we are deeply convinced the duty envisioned by plaintiffs must be rejected as patently unfair and running counter to elementary justice.

A final word in light of the extraordinary facts of this case. Dominguez makes much of Colonial's workplace antiviolence policy, which Colonial purportedly unreasonably ignored.[10]  Although considered in her return as a duty question, Dominguez's framing of the issue is one of causation.  She posits, "This case is about Colonial's failure to enforce its own policy which resulted in severe and lifelong injuries to Dominguez."  Dominguez also submitted the declaration of Michael Corcoran, a security expert.[11]  He concluded that Colonial was negligent and that its negligence caused Dominguez to suffer "substantial harm."[12]  In Corcoran's assessment, Colonial's negligence was due in part to its failure to explain and enforce the workplace antiviolence policy and to provide employee training under the policy. However, Dominguez offers no explanation of how or why these measures would have deterred Kyle's murderous attack.  At best, this aspect of Corcoran's opinion and Dominguez's reliance thereon is an assertion of "abstract negligence" and does not show a causal link between Colonial's purported failure to implement its workplace

---

[10] As mentioned, Colonial's workplace antiviolence policy acknowledged workplace violence is a "growing nationwide concern" and lists behaviors that may constitute workplace violence on and off Colonial's premises.  Significantly, the policy clearly indicates how Colonial *would respond* to such incidents, not, as Dominguez's argument implies, how Colonial *would predict or anticipate such incidents*.

[11] Michael Corcoran is president and owner of Workthreat Group, LLC, which conducts individual security and building/area forensic evaluations.

[12] The trial court declined to rule on Colonial's numerous objections to the admission of Corcoran's declaration but stated it did not rely on the document in denying Colonial's summary judgment motion.

antiviolence policy and Kyle's shooting rampage in the home. (*Noble v. L.A. Dodgers* (1985) 168 Cal.App.3d 912, 917, 918 [expert's claim Dodgers' security was "inadequate" without establishing a causal nexus between the alleged negligence and injury was a "classic example" of abstract negligence].)

## IV. Plaintiffs' Claim of Intentional Infliction of Emotional Distress Against Colonial

" 'The elements of the tort of intentional infliction of emotional distress are: " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . .' Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." [Citation.] The defendant must have engaged in "conduct intended to inflict injury or engaged in with the realization that injury will result." ' " (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 896; accord, *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.)

Plaintiffs allege Colonial intentionally engaged in extreme and outrageous conduct by failing to control or prevent Kyle from harming plaintiffs when Colonial knew or reasonably should have known that he was prone to violence. And as a proximate result of Kyle's harm, plaintiffs have suffered severe emotional distress.

This cause of action fails as a matter of law. As discussed, there are no triable issues that (1) Colonial knew or reasonably should have known that Kyle posed a danger to plaintiffs—Kyle's deadly misconduct was unforeseeable, and (2) Colonial had no ability to control Kyle.

## V. Plaintiffs' Respondeat Superior Claims Against Colonial

Plaintiffs also contend Colonial was vicariously liable under the doctrine of respondeat superior based on Holaday's status as a Colonial employee. To support their derivative claims against Colonial for

negligence, negligent supervision, and intentional infliction of emotional distress, they argue Holaday was acting within the scope of her employment with Colonial.[13]  However, Dominguez's theory of Colonial's respondeat superior liability fails to satisfy the threshold criterion that Holaday was acting within the scope of employment.[14]

Under the doctrine of respondeat superior, " 'an employer may be held vicariously liable for torts committed by an employee within the scope of employment.' " (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 491, italics omitted; accord, *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296.)  "Under certain circumstances, the employer may be subject to this form of vicarious liability even for an employee's willful, malicious, and criminal conduct." (*Patterson,* at p. 491; accord, *Lisa M.*, at p. 297.) "To be within the scope of employment, the incident giving rise to the injury must be an outgrowth of the employment, the risk of injury must be inherent in the workplace, or typical of or broadly incidental to the employer's enterprise." (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1008; see *Lisa M.,* at p. 299 ["The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought"].)

Generally, the determination whether an employee has acted within the scope of employment is a question of fact; it becomes a question of law, however, where, as here, " 'the facts are undisputed

---

[13] Schindler argued there were triable issues that Colonial was vicariously liable under the doctrine of superior liability in her opposition to Colonial's summary judgment motion.  However, she has omitted this argument in her return.  We include Schindler in our analysis because the respondeat superior theory did not apply in this case as a matter of law.

[14] We express no view on the merits of both plaintiffs' direct claims against Holaday.

and no conflicting inferences are possible.' " (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 213.)

The record established that Holaday worked as a dispatcher and employee supervisor for Colonial, a moving and storage company. Kyle was unemployed and Holaday testified Kyle did not work for Colonial before or at the time of the shooting. Nor is there any evidence that Kyle assisted Holaday in her work for Colonial. Thus, Holaday's knowledge and management of Kyle's mental disorder at home was a personal family matter, entirely unrelated to her work for Colonial. Indeed, Dominguez presented no evidence that Holaday was acting within the scope of her employment when she allegedly failed to forestall her son's violent act. Instead, Dominguez merely repeats her arguments that (1) Colonial knew of and benefited from Holaday's practice of working at home, and (2) Holaday's conduct of allowing Dominguez and Schindler into her home was negligent and outrageous.

There is no triable issue that Holaday's purported negligent or intentional misconduct was not an outgrowth of or inherent in her work for Colonial. Nor was it the type of activity that a company like Colonial would perceive as resulting in a loss ordinarily considered as a cost of doing business. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004 [" 'A risk arises out of the employment when "*in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business" ' "].) Respondeat superior liability does not apply here as a matter of law.

Because we find summary judgment should have been ordered in this case, we conclude the trial court misapprehended the dispositive issues in denying Colonial's motion for summary judgment. The triable issues of fact the court found were inconsequential, irrelevant, or not in dispute.

## DISPOSITION

The petition for writ of mandate is granted and the requested writ hereby issues.  The respondent court is directed to vacate its order of July 23, 2020, denying Colonial Van & Storage, Inc.'s motion for summary judgment and enter a new and different order granting Colonial's motion for summary judgment.  Colonial Van & Storage, Inc., is to recover its costs in this proceeding.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

23